IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FUMA INTERNATIONAL LLC,
an Ohio limited liability company,

               *Plaintiff/Counterdefendant*,

    v.

R.J. REYNOLDS VAPOR COMPANY,
a North Carolina corporation,

               *Defendant/Counterplaintiff.*

Civil Action No. 1:19-cv-260
[Lead Case]

Civil Action No. 1:19-cv-660

**PLAINTIFF FUMA INTERNATIONAL LLC'S OPPOSITION TO
DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS
OF STEPHEN A. HOLZEN ON DAMAGES**

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT .......................................................................... 1

II.  ARGUMENT ................................................................................................. 3

    A.   Mr. Holzen's Opinions Properly Apportion the Royalty Rate to
        Account for the Incremental Value of the Patented Invention. .................... 3

        1.   Mr. Holzen uses both an Income Approach (which RJR
             ignores) and a Bill of Materials Analysis (which RJR
             misapprehends) to calculate the incremental value of the
             patented invention. ........................................................................... 3

        2.   Mr. Holzen's valuation of the patented invention is properly
             grounded in a reliable methodology, and well supported by
             RJR's own internal evaluations of the invention. ............................. 6

    B.   Mr. Holzen's Apportionment Analysis Properly Accounts for RJR's
        Contributions to the Accused Products. ...................................................... 10

    C.   Mr. Holzen Carefully Considered and Applied the *Georgia-Pacific*
        Factors to the Facts of This Case. ............................................................... 11

    D.   Mr. Holzen's Opinion that the Patented Invention Drives Consumer
        Demand is Reliably Based on RJR's Documents and the Opinions of
        Fuma's Technical Expert Dr. Vallee. ........................................................... 15

    E.   Mr. Holzen's Apportionment Calculates the *Relative* Cost of the
        Relevant Components, Which Is Precisely What a Proper
        Apportionment of Value Should Do. ........................................................... 18

    F.   Mr. Holzen's Ciro Apportionment Analysis Reliably Uses An
        Analysis of the Component Cost of the Solo Because RJR Does Not
        Manufacture the Ciro and Because This Approach Results in a
        Conservative (Lower) Royalty Rate Consistent with Apportionment
        Theory under GP Factor 13. ........................................................................ 18

    G.   Mr. Holzen's Lump Sum Royalty Opinions are Based on RJR's
        Sales Projections and Account for Declining Sales of the Infringing
        Products. ....................................................................................................... 19

III. CONCLUSION ............................................................................................... 22

Plaintiff Fuma International LLC ("Fuma") submits its opposition to Defendant R.J. Reynolds Vapor Company's ("RJR") motion to exclude the testimony and opinions of Stephen A. Holzen on damages (Dkt. 158).[1]

## I.  PRELIMINARY STATEMENT

RJR seeks to disqualify Fuma's damages expert Stephen Holzen from testifying at trial. Mr. Holzen's proposed testimony, based on his written expert reports, is properly-grounded, well-reasoned, and not speculative. Using a reliable methodology and scores of confidential documents from both RJR and Fuma, other facts and publicly available documents, and drawing on his years of experience, Mr. Holzen has opined on a range of relevant subjects that will assist a jury in assessing the damages Fuma has suffered from RJR's infringement.

RJR does not dispute that Mr. Holzen has the academic and professional experience in the relevant field of patent damages, which he most certainly has.  Nor does it argue that Mr. Holzen lacks the educational or professional pedigree to be an expert. RJR also does not assert Mr. Holzen's use of the well-established *Georgia-Pacific* analysis to arrive at his findings and opinions is an improper or flawed methodology. Instead, and as set forth in greater detail *infra*, RJR argues—wrongly—that Mr. Holzen employed a flawed methodology because, according to RJR, he failed to sufficiently explain his analysis and opinions in his expert reports.

---

[1] Citations to "Dkt. __" reference documents appearing on the court's electronic docketing system; pin cites are to the numbers appearing in the ECF footer.

1

For example, RJR argues, contrary to the evidence, that Mr. Holzen did not adequately support his assumption that the patented invention was the driver of the demand for the Accused Products. Yet, Mr. Holzen's Opening Expert Report actually relies on RJR's own documents which specifically praise Fuma's invention by name and state Fuma's technology is the "best way forward" for RJR and that the invention offered the "highest potential" for success.

RJR's criticisms of Mr. Holzen's opinions reveal that it (a) misapprehends the methodology Mr. Holzen actually used and (b) that it takes issue not with Mr. Holzen's methodology but with certain of his conclusions—facts RJR does not like and therefore disputes. While such disputes may provide fodder for Mr. Holzen's cross-examination, they are not "grounds for excluding his testimony under Rule 702." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003).

Mr. Holzen's reasonable royalty methodology is well-supported, reasonable, and the data and evidence on which he relies are sufficiently tied to the facts of this case. To the extent RJR disagrees either with Mr. Holzen's choice of methodology or with his conclusions, RJR is free to raise its challenges during cross examination at trial because "the inquiry on the correctness of [his] methodology and of the results produced thereunder belongs to the factfinder." *Summit 6, LLC v. Samsung Elec. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). RJR's motion to exclude Mr. Holzen's testimony should be denied.

## II.   ARGUMENT

### A.   Mr. Holzen's Opinions Properly Apportion the Royalty Rate to Account for the Incremental Value of the Patented Invention.

    1.   <u>Mr. Holzen uses both an Income Approach (which RJR ignores) and a Bill of Materials Analysis (which RJR misapprehends) to calculate the incremental value of the patented invention.</u>

As he explains in both his Opening and Rebuttal Expert Reports, Mr. Holzen's opinion relies on the well-established Income Approach— a methodology of quantitative valuation to determine a reasonable royalty rate.  *See* Holzen Opening Expert Report, attached hereto as Exhibit 1, at ¶175.  This is important because RJR disregards Mr. Holzen's Income Approach methodology of quantitative valuation that apportions profits using cost data for apportionment.  Indeed, nowhere in its *Daubert* motion does RJR even mention, let alone acknowledge, the Income Approach, or Mr. Holzen's use of it.  *See generally* Dkt. 162 (Memorandum in Support of Reynold's Motion to Exclude the Testimony and Opinions of Stephen A. Holzen on Damages).

Under the Income Approach, "the value of the subject intangible asset [such as a right to use a patented technology] is the present value of the expected economic income to be earned from the ownership of that intangible asset." Ex. 1 at ¶175.  As part of his use of the Income Approach, Mr. Holzen performed "an analysis of the profits that RJRV[2] earned from the sale of Accused Products and an analysis of the profits that Fuma

---

[2] As used in this opposition, "RJRV" and "RJR" refer to the defendant.

would have earned from the sale of the Embodying Products." *Id.* at ¶176.[3] Mr. Holzen

noted that in 2017, sales of the Accused Products produced gross profits of ███, and

sales of the Accused Cartridges produced gross profits of ███ *Id.* at ¶¶182, 185.

Then, using a Bill of Materials analysis (or "BOM Analysis"), Mr. Holzen

properly apportioned the profit indicators on which he relied for his Income Approach

quantitative evaluation—███████████ *Id.* at ¶186. "A BOM Analysis shares

profits between licensing parties based on a comparison of the cost of the patented

features relative to cost for the entire product." *Id.* Mr. Holzen explains that he

apportioned the two profit indicators on which he relied "[i]n recognition of the fact that

RJRV has contributed its own manufacturing processes, has taken on the business risks of

selling Fuma's patented invention at a national scale and is managing the process of

distributing the Accused Products through thousands of its retailer customers." *Id.*

It is well-settled that "apportionment can be addressed in a variety of ways,

including 'by careful selection of the royalty base to reflect the value added by the

patented feature [or] ... by adjustment of the royalty rate so as to discount the value of a

product's non-patented features; or by a combination thereof.'" *Exmark Mfg. Co. Inc. v.

Briggs & Stratton Power Prods.*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (quoting

*Ericsson, Inc., v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (internal

modification and ellipsis in original)). "The Federal Circuit does not limit apportionment

---

[3] The "Accused Products" are the Vuse Solo and the Vuse Ciro; the "Embodying
Products" are listed in the table at paragraph 57 of Mr. Holzen's Opening Expert Report.

to specific methodologies, because flexibility is required to determine fact-dependent damages." *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-152-RGA, 2018 WL 4691047 at *6 (D. Del. Sept. 9, 2018). Mr. Holzen's apportionment via the royalty *rate* while using the Accused Products as a royalty *base* is an acceptable methodology. *Exmark*, 879 F.3d at 1348 (citing *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

The Federal Circuit has recognized the validity of different forms of apportionment, including those based on cost. *See, e.g.*, *Summit 6*, 802 F.3d at 1297-99 ("In this case, Mr. Benoit's damages methodology was based on reliable principles and was sufficiently tied to the facts of the case. Mr. Benoit first estimated Samsung's economic benefit from infringement by specifically focusing on the infringing features and by valuing those infringing features based on Samsung's own data regarding use and on its own financial reports outlining *production costs and profits*. Mr. Benoit then envisioned a hypothetical negotiation in which the parties would have bargained for respective shares of the economic benefit, given their respective bargaining positions and alternatives to a negotiated agreement. Mr. Benoit's methodology was structurally sound and tied to the facts of the case.") (emphasis added); *see also Labyrinth Optical Techs. LLC v. Alcatel-Lucent USA, Inc.*, cv-120759, 2015 WL 12720323, at *6 (C.D. Cal. Mar. 10, 2015) (characterizing as "reliable" expert's methodology of apportioning the value of a multi-component product by comparing the cost of the patented component to the cost of the prior art optical component). RJR is, of course, free to disagree with the component cost approach—and to cross-examine Mr. Holzen at trial about why he chose this

5

approach—but RJR's preference for other approaches is no grounds for finding unreliable a method that the Federal Circuit has itself sanctioned.

       2.    <u>Mr. Holzen's valuation of the patented invention is properly grounded in a reliable methodology, and well supported by RJR's own internal evaluations of the invention.</u>

RJR's disparagement of Fuma's patented invention as merely "a patented arrangement" of conventional components, Dkt. 162 at 6, is misplaced—both because such disparagement is not appropriate in a *Daubert* motion challenging the reliability of a *damages* expert's testimony, and because it misapprehends the law on patent damages. As the Federal Circuit has explained, "[i]n practice, 'all inventions are for improvements; all involve the use of earlier knowledge; all stand upon accumulated stores of the past.'" *AstraZeneca AB v. Apotex Corp.,* 782 F.3d 1324, 1338 (Fed. Cir. 2015) (quoting *Cincinnati Car Co. v. N.Y. Rapid Transit Corp.*, 66 F.2d 592, 593 (2d Cir.1933)). RJR would have the Court believe that the value of old components used in a new combination should not be counted when valuing the new combination. *See, e.g.*, Dkt. 162 at 18 ("Mr. Holzen's failure to appropriately measure damages is particularly acute given that the components included in his cost analysis are not exclusive to the patented arrangement – they also exist in other e-cigarettes."). RJR's approach—which would see the Court ignore the value of old components used in a new way—contravenes established Federal Circuit precedent.

RJR's approach would also and significantly undervalue the contributions of new combinations, which form the vast majority of all new patented inventions. As the

6

Federal Circuit has explained, "it has long been recognized that a patent that combines 'old elements' may 'give[] the entire value to the combination' if the combination itself constitutes a completely new and marketable article." *AstraZeneca*, 782 F.3d at 1339 (quoting *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 614 (1912) (in turn citing *Hurlbut v. Schillinger*, 130 U.S. 456, 472 (1889) (internal modification in original)). Fuma's patented invention is more than a new arrangement of conventional elements, as Fuma will demonstrate at trial.

In any event, howsoever RJR may characterize Fuma's patented invention in its papers, it cannot deny that Mr. Potter, Vice President of Strategic Innovations at RJR's sister company, R.J. Reynolds Tobacco Company ("RJRTC"), characterized Fuma's invention as a "unique design and operation" when he analyzed it while searching for and investigating promising new technologies and product opportunities. *See* Ex. 1 at ¶¶89-90. Notwithstanding RJR's litigation-induced characterization of the patented invention, the important point is that the Federal Circuit recognizes that to value a new combination properly, the value of all of its components—even "old components" must be included; otherwise the patented invention will be significantly undervalued. As the Federal Circuit explained in *AstraZeneca*, "[f]or a patent that combines 'old elements,' removing the value of all of those elements would mean that nothing would remain." 782 F.3d at 1339. Indeed, the value of an old element may be substantially enhanced by its use in a new combination. Thus, the Federal Circuit has cautioned that "while it is important to guard against compensation for more than the added value attributable to an invention, it

is improper to assume that a conventional element cannot be rendered *more valuable* by its use in combination with an invention." *Id.* at 1338 (emphasis added).

The question in cases involving such combination patents "is how much new value is created by the novel combination, beyond the value conferred by the conventional elements alone." *Id.* at 1339. Mr. Holzen appropriately determined the new value created by the novel combination by correctly apportioning value between the patented and non-patented features of the Accused Products. First, Mr. Holzen determined that the patented invention is the basis for consumer demand for the Accused Products. *See* Ex. 1 at ¶¶138-145. Second, Mr. Holzen determined that the non-patented elements of the Accused Products are not points of differentiation and do not drive consumer demand for the Accused Products. *See id.* at ¶¶146-147. Third, Mr. Holzen took full account of RJR's contributions through its own manufacturing process, assumption of business risk in national sales, and managing the distribution process as part of the apportionment process. *See id.* at ¶186. Fourth, Mr. Holzen apportioned the profit indicators for the Accused Products using the well-established Bill of Materials (BOM) Analysis, which shares profits between licensing parties based on a comparison of the cost of the patented features relative to the cost of the entire product. *Id.* Fifth, to the extent any component, such as the battery, encompassed both patented and non-patented features Mr. Holzen allocated the entire value to RJR. *See id.* at ¶188 (explaining that he allocated the full value of the power source in the Accused Products to RJR); *see also* Holzen Responsive Expert Report, attached hereto as Exhibit 2, at ¶81 ("Had I included the cost of the

8

battery in my BOM Analysis, then my damages [calculation] would have been materially greater."); *id.* at ¶83 ("Ms. Distler points out that RJRV added technologies such as the 'encryption technology to prevent the use of imitation cartridges in the Solo power unit and a LED indicator and user interface to communicate the status of the battery life and the cartridge life.['] All of these elements are included in the battery and, as discussed, my BOM Analysis allocates the value of these alleged improvements to RJRV.") (internal citation omitted). By excluding the elements of the Accused Products that were not related to the patented invention—or that were only partly related to the patented invention, such as the battery or power source—Mr. Holzen quantitatively apportioned the royalty rate to just the patented invention, notwithstanding the fact that the patented invention drives consumer demand for the Accused Products.

As discussed above, the Federal Circuit has approved of the use of component cost comparisons for determination of a reasonable royalty. *Summit 6*, 802 F.3d at 1297 (Fed. Cir. 2015) ("Mr. Benoit used Samsung's annual reports, internal cost and revenue spreadsheets, and interrogatory responses to determine that the camera component accounted for 6.2% of the phone's overall production cost. Accordingly, he attributed 6.2% of Samsung's revenue from selling each phone—i.e., $14.15—to the camera's functionality.") (internal record citation omitted). "Where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the fact finder." *Id.* at 1296. Mr. Holzen's costed

9

Bill of Materials Analysis is reasonable and intimately tied to the facts of this case. RJR's criticisms of Mr. Holzen's apportionment analysis do not warrant the exclusion of his testimony because they are, at bottom, only disagreements about contested facts. *See Plastic Omnium Advanced Innovation and Res. v. Donghee Am., Inc.*, 387 F. Supp. 3d 404, 414 (D. Del. 2018) (denying motion to exclude and rejecting argument that expert failed to apportion; any "concerns are adequately addressed through proper cross-examination and presentation of competing evidence"); *accord Carucel Inv., L.P. v. Novatel Wireless, Inc.*, No. 16-CV-118-H-KSC, 2017 WL 1215838, at *6 (S.D. Cal. Apr. 3, 2017) ("Here, Dr. McDuff provides a reasonable explanation for his apportionment, and, to the extent Plaintiff disagrees with his apportionment, Plaintiff may address the issue through cross-examination.").

## B. Mr. Holzen's Apportionment Analysis Properly Accounts for RJR's Contributions to the Accused Products.

RJR contends that Mr. Holzen did not consider its contributions to the Accused Products. Dkt. 162 at 21-25. Not true. As a threshold matter—and, as noted above—Mr. Holzen expressly took account of "the fact that RJR has contributed its own manufacturing processes, has taken on the business risks of selling Fuma's patented invention at a national scale and is managing the process of distributing the Accused Products through thousands of its retailer customers." Ex. 1 at ¶186. Second, Mr. Holzen also took RJR's relative contributions into account in his Bill of Materials (BOM) Analysis when he included only the elements related to the patents-in-suit towards the incremental value of the patented inventions. *See id.* at ¶187 (initially

10

including in his calculation for the kit only the e-liquid, end cap, base, terminals, heater element, flow tube, stainless-steel housing, and substrate components, and for the cartridge only the e-liquid, an end cap, a base, terminals, a heater element, a flow tube, the power unit, and the external tube, which all relate to the patented invention). Third, Mr. Holzen took RJR's relative contributions into account when assessing the drivers of consumer demand for the Accused Products, and, based on RJR's own documents, concluded that the non-patented elements were used by others in the industry besides RJR and did not provide a point of differentiation between accused and non-Accused Products. *See id.* at ¶¶146-147 (referencing documents that show "that others, besides RJRV, were using microprocessors, indicator lights, and a power source," and noting that "the point of differentiation, by Mr. Potter's and RJRV's own admission, was the technology patented by Fuma which was better and different ('magic' and 'enabling') than any of the existing e-cigarette products that RJRTC had analyzed and provided a better user experience that was more like a traditional cigarette."). RJR may not like or agree with Mr. Holzen's assessment of the relative value of RJR's contribution to the Accused Products, but that is no basis for ruling Mr. Holzen's methodology is flawed.

C. **Mr. Holzen Carefully Considered and Applied the *Georgia-Pacific* Factors to the Facts of This Case.**

RJR does not dispute that Mr. Holzen considered the *Georgia-Pacific* factors. Instead, it contends that Mr. Holzen did not tie them to his reasonable royalty rate of

11

14%.[4] Dkt. 162 at 25-26.   Not so.  In his opening expert report, Mr. Holzen explains

that, with respect to *Georgia-Pacific* factor 13—which relates to the portion of the

realizable profit that should be credited to the invention as distinguished from non-

patented elements, the manufacturing process, business risks, or significant features or

improvements added by the infringer—he provided a quantitative assessment of the

portion of the realizable profit that should be credited to the invention as distinguished

from non-patentable elements of the Accused Products as part of his Income Approach.

Ex. 1 at ¶266.  Mr. Holzen goes on to provide a qualitative assessment as well, noting

that at the time of the hypothetical negotiation, Fuma would have recognized that its

would-be licensee, RJR, "would, under the construct of the hypothetical license

agreement, be assuming risk of the manufacture and sale of the Accused Products and

would seek to pay a lower royalty in order to be compensated for the assumption of such

risk."  *Id.* at ¶268.  Mr. Holzen concluded that "[t]his  factor has a downward influence

on the reasonable Royalty Range."  *Id.*

Mr. Holzen's *Georgia-Pacific* analysis was, in fact, extensive.  *See* Ex. 1 at ¶¶227-

277 (addressing each of the *Georgia-Pacific* factors in turn, and explaining the effect of

each factor—whether positive, negative, or neutral—on the overall royalty rate that the

parties would have contemplated during the hypothetical negotiation).  And Mr. Holzen's

14% reasonable royalty rate is directly tied to his analysis of the *Georgia-Pacific* factors.

---

[4] Mr. Holzen determined that the range of reasonable royalty rates was between 14% and
16.6%.  Ex. 1 at ¶¶ 275-76.

*See, e.g., id.* at ¶¶252-261, 275-277. Of particular importance is Mr. Holzen's discussion of factor 11— the extent to which the infringer has made use of the invention and any evidence probative of the value of that use. *See id.* at ¶¶252-261.

As Mr. Holzen explains, RJR's own documents reveal that "[r]elative to all of the other products on the market in 2009/2010, RJRTC noted that it saw 'more potential' in Fuma's design than 'any of the others,' and that Fuma's design had generated [the] 'highest interest to date' at RJRTC." *Id.* at ¶254 (internal citations omitted). Mr. Holzen also notes that between 2011 and 2013, "RJRTC appears to have considered a number of alternative product concepts and designs, including various heat-not-burn, vapor, and hybrid designs," and that, ultimately, "RJRTC decided to use Fuma's 'enabling' design in a way that allowed it to 'place a 'bet'' on the growing ecigarette sector." *Id.* at ¶255 (internal citations omitted). Mr. Holzen also notes that he has "not seen any evidence that RJR has commercialized any of these other alternative cig-a-like designs." *Id.* (internal citations omitted).

Mr. Holzen goes on to explain that "[b]y November 2014, the Vuse Solo was distributed in about 70,000 outlets in the U.S.," and that "RJRV told investors that the performance of Vuse was 'astounding.'" *Id.* at ¶257 (internal citations omitted). "By January 2017, the Vuse brand had the most market share for vapor products, with approximately a 30% share of the market in traditional channels." *Id.* at ¶258. RJR regularly provided investors and financial analysts with widely-drawn examples of high

praise for the Vuse product in the years following its launch into the market. *See id.* at ¶¶259-60.

These considerations all support Mr. Holzen's reliance on the Income Approach, in accordance with which Mr. Holzen undertook "an analysis of the profits that RJR earned from the sale of Accused Products and an analysis of the profits that Fuma would have earned from the sale of the Embodying Products." *Id.* at ¶176. Mr. Holzen determined that in 2017, the year in which the hypothetical negotiation would have taken place, RJR's gross profits from sales of the Accused products was ▮▮▮▮ and its gross profits from sales of the Accused Cartridges was ▮▮▮. *Id.* at ¶¶182, 185. During the same year, "Fuma earned operating profit margins of 16.1% from the sale of its Embodying Products," a rate that subsequently rose in 2018 and 2019. *Id.* at ¶192.

Having made these determinations, Mr. Holzen then properly apportioned the relative value of the patented invention using a BOM Analysis, which, as noted above, "shares profits between licensing parties based on a comparison of the cost of the patented features relative to cost for the entire product." *Id.* at ¶186. Based on that analysis, Mr. Holzen was able to calculate the reasonable royalty range as being between 14% and 16.6%. *Id.* at ¶¶275-76. Taking a conservative approach that recognizes that "RJRV was a large company with the resources and relationships to sell the Accused Product nationally and that the [hypothetical licensing] agreement would have been structured on non-exclusive terms," Mr. Holzen concluded "that the parties would negotiate a final royalty at the low end of the Reference Range (14.0%)." *Id.* at ¶277.

14

Mr. Holzen's analysis is intimately tied to, and reflects his careful consideration of, the *Georgia-Pacific* factors relevant to the facts of this case. To the extent RJR disagrees with Mr. Holzen's conclusions, it is free to challenge those conclusions in cross-examination at trial.

> **D.** **Mr. Holzen's Opinion that the Patented Invention Drives Consumer Demand is Reliably Based on RJR's Documents and the Opinions of Fuma's Technical Expert Dr. Vallee.**

Mr. Holzen reasonably relied on discussions with Fuma's technical expert, Dr. Vallee, the deposition testimony of the inventor, Mr. Conley, and RJR's own documents to determine that the patented invention is the driver of customer demand for the Accused Products. *See* Ex. 1 at ¶¶138-147.

As Dr. Vallee has opined, the prior art e-cigarettes suffered from numerous problems such as the burnt taste that occurred when the heating coil was placed in the batting material soaked with the e-liquid, the inability to use all of the e-liquid in a cartridge before the taste experienced by the user became unpleasant, and the inability to control the volume of vapor that a user could create when using the pre-existing devices and to deliver a full and satisfying volume of vapor. Rebuttal Expert Report of Glenn Vallee, Ph.D. Regarding Validity of the '604 and '881 Patents, Dkt. 181-2 at ¶92.

As Dr. Vallee explains in his Rebuttal Expert Report on Validity, these problems were overcome when Mr. Conley and Mr. Hillenbrandt conceived of vaporizing the e-liquid "in the airflow" passing though and along a central airflow passageway surrounded by the e-liquid. Dkt. 181-2 at ¶93. The claimed invention also addresses the problems

15

with the pre-existing devices by positioning the heating coil transversely across the airflow passageway and using a wick or other mechanism for drawing the e-liquid from the solution holding medium into close proximity to the heating coil. *Id.* In this manner, any batting material used as the solution holding medium would not be burned and the user would not experience a burnt taste. *Id.* Likewise, the e-liquid delivered to the heating coil would provide for as much vapor as the user wanted to inhale. *Id.* And because the e-liquid was moved to a central location in the airflow passageway before it was heated, the full amount of e-liquid placed in the cartridge could be used before the user experienced any foul or unpleasant burning or metallic taste. *Id.*

These benefits of the patented invention are directly attributable to the claimed elements, including the patented arrangement. These benefits were recognized by RJR when it analyzed the original Fuma E-Cigarette, a commercial embodiment of Fuma's patented invention, in 2010, which RJR described as "magic" and "enabling." *See* Ex. 1 at ¶145. As detailed in Mr. Holzen's Opening Expert Report, RJR's documents characterized the patented invention as, *inter alia*, a "new central flow design," "satisfying with pleasant taste," and "the best way forward." *See id.* at ¶¶143-145.

And, as the analysis of Fuma's technical expert, Dr. Vallee, confirms, the original Fuma E-Cigarette that RJR inspected embodied every asserted claim of the '604 and '881 patents and was fully disclosed in the priority patent application for the '604 and '881 patents (U.S. Application Ser. No. 12/843,917) that was filed with the United States Patent and Trademark Office on July 27, 2010. Dkt. 181-2 at ¶¶101-104.

16

Soon after its meeting with Fuma in 2010, RJR focused on the e-cigarette design that became the Solo. *See* Ex. 1 at ¶101 (citing RJRV-F000695725 - RJRV-F000695726). ██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████[5] *See id.* at ¶¶108-109 (citing Dep. of Jason Short, June 16, 2020, at 89:16-24, 90:1-91:8, 118:1-7, and 118:15-22). The Solo and Ciro products are similar, and Ciro was originally marketed under the brand name Vuse Solo+ but was renamed Vuse Ciro to avoid confusion in the market. *See* Dkt. 122-2 at 2 n.2.

The benefits enabled by the patented invention that drive consumer demand did not end in 2011, 2017, or 2021. RJR first recognized the value of Fuma's enabling technology in 2010 and continued to recognize that value when RJR incorporated Fuma's patented invention into RJR's Solo and Ciro products—products that could not be changed because of FDA regulations. Mr. Holzen's opinion is reliably based on admissible and probative documents and deposition and expert testimony. As discussed above, Mr. Holzen's opinions faithfully account for the value of the patented technology when infringement began.

---

[5] The FDA published a rule "Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products" that extended the FDA's regulatory authority to encompass, inter alia, previously unregulated e-cigarettes.

### E. Mr. Holzen's Apportionment Calculates the *Relative* Cost of the Relevant Components, Which Is Precisely What a Proper Apportionment of Value Should Do.

RJR argues that Mr. Holzen's reliance on the cost of components to value the patented combination "inflates the royalty rate where more costly components are used in the accused products. . . ." Dkt. 162 at 19. Again, this is not so. To the contrary, as Mr. Holzen explained in his Responsive Expert Report:

> As illustrated in Exhibit 19 of the Affirmative Holzen Report my BOM Analysis was performed each year from 2014 through 2020 and shows a range of allocation rates ███████████). This means that the available allocation rates are consistent for all years in the analysis. I also note that my allocation rate of ██████ is the lowest rate of allocation. In other words, if I were to adopt a different year as the basis for selecting the allocation rate my damages would have been greater.

Ex. 2 at ¶80. As Mr. Holzen points out, it is the relative cost of components—not their absolute cost—that matters in an apportionment analysis. And given that he relied on the relative cost of the relevant components in 2017, when that relative cost was at its lowest, his royalty rate was correspondingly lower than it would have been had he used the relative cost of the same components in any other year.

### F. Mr. Holzen's Ciro Apportionment Analysis Reliably Uses An Analysis of the Component Cost of the Solo Because RJR Does Not Manufacture the Ciro and Because This Approach Results in a Conservative (Lower) Royalty Rate Consistent with Apportionment Theory under GP Factor 13.

Mr. Holzen analyzed the Bill of Materials data produced by RJR for both the Solo and Ciro products. As Mr. Holzen noted in his Opening Expert Report, the Ciro product is made abroad and imported to the United States and the Ciro Bill of Materials

18

information Mr. Holzen reviewed lists costs to RJR by category. Mr. Holzen based his Bill of Materials Analysis on the Solo Bill of Materials. Ex. 1 at ¶187. Significantly, RJR does not assert that applying a BOM analysis to the Ciro products would cause a lower apportionment to the patented invention—and for good reason: it would not, as "some of the SOLO components, such as the communications terminal and substrate, are not found in the CIRO device." Dkt. 162 at 29 (*comparing* Dkt. 122-1 at 25 *with* Dkt. 122-2 at 27). Mr. Holzen's apportionment analysis based on the Solo Bill of Materials is therefore more conservative, resulting in a lower reasonable royalty rate than would otherwise apply.

### G. Mr. Holzen's Lump Sum Royalty Opinions are Based on RJR's Sales Projections and Account for Declining Sales of the Infringing Products.

As Mr. Holzen explains in his expert reports, RJR's transaction history, industry considerations, and party considerations all establish that either a lump sum payment or a running royalty were both potentially acceptable payment structures for a license agreement reached during the hypothetical negotiation. *See* Ex. 1 at ¶¶132-136.

For example, Mr. Holzen notes that "RJRV's projected success in the market using the Patents-in-Suit" would have motivated the would-be licensee to consider structuring the royalty payments as "a one-time royalty equal to the present value of the future royalties it would expect to pay for its ongoing use of the Patents-in-Suit." *Id.* at ¶132. Mr. Holzen explains that "[i]n this way the one-time royalty payment could be lower than the total annual royalties paid through patent expiration [on] an ongoing

19

basis." *Id.* At the same time, paying a one-time lump sum royalty would allow RJR to "avoid the administrative burden of periodic royalty audits to confirm compliance with the terms of the license agreement." *Id.*

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███ *See id.* at ¶133 ██████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████ There is nothing "prejudicial"—let alone "highly prejudicial," Dkt. 162 at 8, in presenting the jury with a figure that represents the present value of the future royalties RJR would expect to pay for its ongoing use of the patented invention, especially given that RJR regularly engages in licensing negotiations that result in agreements to pay just such figures.

Mr. Holzen's forecasts are based both on RJR's forecasts and on industry forecasts. *See* Ex. 1 at ¶125 (citing RJRV-F000071648, RJRV-F000601552 - RJRV-F000601570 at 601561); *id.* at ¶155 (discussing three sales forecasts made by RJR in 2014, 2016 and 2017). Given that the patents-in-suit issued in 2017 and 2019 and do not expire until 2030, Mr. Holzen's assumption that there would be more sales of the Accused Products in the next 10 years than there were in the past 3 years is reasonable.[6] And as he explains in his Responsive Expert Report, Mr. Holzen's two original revenue

---

[6] Mr. Holzen's opinions in his reports are directed to RJR's sales through 2019 and projected sales for 2020 – 2030.

projections are declining in present value terms. *See* Ex. 2 at ¶84 ("As illustrated in Exhibit 2a of the Affirmative Holzen Report one of my projections uses a revenue growth rate of 3% and a discount rate of 12.46%. What this means is that in present value terms, my revenue projections are declining."); *id.* at ¶85 ("In addition, and as illustrated in Exhibit 2b of the Affirmative Holzen Report, my other projection assumes a revenue growth rate of 8% and a discount rate of 11%. What this means is that in present value terms my revenue growth rates are declining."). Mr. Holzen addresses Ms. Distler's Report and RJR's newly produced financial discovery in his Responsive Expert Report with a third revenue projection that reflects a 3% annual revenue decline in present value terms. *See id.* at ¶¶86, 106-107.

None of Mr. Holzen's projected revenue scenarios ignore business realities or rely on sheer speculation as RJR wrongly contends. *See* Dkt. 162 at 30-32.  Mr. Holzen's first projected revenue scenario incorporates a 3% growth rate because that is equal to the inflation growth rate in 2019, while his second projected revenue scenario incorporates an ███████████████████████████. *See* Ex. 1 at ¶160.  Mr. Holzen then applied a discount rate that considers the time value of money along with the risk and uncertainty of the projections that a typical party would expect in the normal course of its business within the Tobacco and Cigarette industry using the well-recognized Build-Up Method. *See id.* at ¶¶162-171.  Mr. Holzen's Responsive Expert Report addresses newly produced RJR financial discovery to account for apparent declining

revenue in both his first and second projected revenue scenarios.  *See*  Ex. 2 at ¶¶100 -

105.

Mr. Holzen carefully explains why a lump-sum royalty would have been

considered in a hypothetical negotiation and his lump-sum royalty calculations are

soundly based on accepted methodology and considered business realities.  There is no

basis for excluding his lump-sum royalty opinion.

## III.    CONCLUSION

For these reasons, RJR's motion to exclude the testimony and opinions of Stephen

A. Holzen on damages should be denied.


Respectfully submitted,


Dated:  July 29, 2022                  /s/ William K. Davis
                                       William K. Davis
                                       N.C. Bar No. 1117
                                       Kevin G. Williams
                                       N.C. Bar No. 25760
                                       BELL, DAVIS & PITT, P.A.
                                       100 North Cherry St., Suite 600
                                       Winston-Salem, NC 27120-1029
                                       Telephone: (336) 722-3700
                                       Facsimile: (336) 722-8153
                                       wdavis@belldavispitt.com
                                       kwilliams@belldavispitt.com

                                       /s/ Christopher P. Sullivan
                                       Christopher P. Sullivan
                                       ROBINS KAPLAN LLP
                                       800 Boylston Street
                                       Suite 2500
                                       Boston, MA  02199

22

Telephone: (617) 267-2300
Facsimile: (617) 267-8288
csullivan@robinskaplan.com

/s/ Dirk D. Thomas
Dirk D. Thomas
DIRK D. THOMAS PLLC
1775 Eye Street NW, Suite 1150
Washington, DC  20006
Telephone: (202) 587-5690
Facsimile: (202) 587-5610
dirk.thomas@dthomasllc.com

/s/ Brandon M. Jordan
Brandon M. Jordan
THE LAW FIRM OF BRANDON M.
JORDAN PLLC
2800 Eisenhower Ave., Suite 220
Alexandria, VA  22314
Telephone: (703) 493-0231
Facsimile: (703) 832-4806
brandon@brandonjordan.net

/s/ Robert A. Auchter
Robert A. Auchter
AUCHTER PLLC
1629 K Street, NW
Suite 300
Washington, DC  20006
Telephone: (703) 585-5721
Facsimile: (703) 525-6059
robert@auchterlaw.com

Counsel for *FUMA INTERNATIONAL, LLC*

23

**CERTIFICATE OF WORD COUNT**

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that this Brief complies with the word limit contained in L.R. 7.3(d)(1), using the word count feature of the word processing software in making this certification.

/s/ William K. Davis
William K. Davis

**CERTIFICATE OF SERVICE**

I hereby certify that, on Thursday, July 29, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

/s/ William K. Davis
William K. Davis