# EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2

3

4     FUMA INTERNATIONAL, LLC,
      an Ohio Limited Liability
5     Company,

6            Plaintiff/Counterdefendant,

7
             vs.        CASE NOS. 1:19-cv-00260 and
8                                 1:19-cv-00660

9     RJ REYNOLDS VAPOR COMPANY,
      a North Carolina Company,
10
             Defendant/Counterplaintiff.
11

12                         - - - -

13

14        Videotaped Deposition of GREGORY D. CONLEY,

15    taken as if upon cross-examination before Laura L.

16    Ware, a Notary Public within and for the State of

17    Ohio, at the offices of Medina Court Reporters,

18    Inc., 209 North Broadway Street, Medina, Ohio, at

19    9:34 a.m. on Wednesday, December 4, 2019, pursuant

20    to notice and/or stipulations of counsel, on behalf

21    of the Defendant/Counterplaintiff in this cause.

22

23              MEDINA COURT REPORTERS, INC.
             REGISTERED PROFESSIONAL REPORTERS
24              209 North Broadway Street
                  Medina, Ohio 44256
25                  (330) 723-2482
                  MCRMedina@msn.com

1

2   APPEARANCES:

3         Dirk D. Thomas, PLLC,
          by Dirk D. Thomas, Esq.
4
          - and -
5
          The Law Firm of Brandon M. Jordan, PLLC
6         by Brandon M. Jordan, Esq.

7              On behalf of the Plaintiff/Counterdefendant;

8         Haynes and Boone, LLP,
          by Ralph J. Gabric, Esq.
9         Laura Beth Miller, Esq.

10        - and -

11        RAI Services Company,
          Drew Leyes, Esq.
12
               On behalf of the Defendant/Counterplaintiff.
13
    ALSO PRESENT:
14
          Scott Smith, Videographer
15
                              - - -
16

17

18

19

20

21

22

23

24

25

```
 1   Q.   So you mentioned that you took the top off the
 2        Smoke 51 two-piece device, correct?
 3   A.   Yes, sir.
 4   Q.   Did you investigate the internal structure of any
 5        other two-piece device prior to filing your
 6        provisional application?
 7   A.   Yes, I did.
 8   Q.   What other pieces did you investigate the internal
 9        structure of?
10   A.   I specifically remember looking at a Loong Totem.
11        I tore the cap off of it, too.
12   Q.   Any others?
13   A.   I believe there might have been others, but right
14        now my memory, I cannot recollect that, which ones
15        or how many.
16   Q.   And so you can't say whether this device in
17        Defendant's Exhibit 2, whether that's the Smoke 51
18        two-piece that you ordered?
19   A.   I can't say it is or isn't, but it very well may
20        be.
21   Q.   Why may it be?  What causes you to say that?
22   A.   Because all those cartomizers, before we made our
23        engineering changes and our patented design, were
24        all made the same.
25   Q.   Had the same structure?
```

```
1    A.   The same general build.

2    Q.   What do you mean by same general build?

3    A.   Where the heating element was in the batting

4         material.

5    Q.   And what do you mean by that?

6    A.   The liquid holding area.

7    Q.   So let's go through Defendant's Exhibit 2.

8    A.   Can I ask before we begin the next question, can we

9         have a quick break?  I'm having a little bit of

10        nicotine attack here.

11                   MR. GABRIC:  Yeah.

12                   MR. THOMAS:  Do you mind?  We want to

13             try to keep them short because we don't want to

14             stretch the day out and I know you don't

15             either.

16                   MR. GABRIC:  No, that's fine.

17                   MR. THOMAS:  We'll keep it down to a

18             few minutes.

19                   MR. GABRIC:  Yeah, I don't want him to

20             have nicotine withdrawal.  You may, too, I

21             don't know.

22                   THE VIDEOGRAPHER:  Okay.  Off the

23             record at 10:16.

24                             -  -  -  -

25                   (Thereupon, a recess was had.)
```

1                                  - - - -

2                    THE VIDEOGRAPHER:  We are back on the

3            record at 10:22.

4    Q.   Okay.  Back to Defendant's Exhibit 2, Mr. Conley.

5         And I want to focus on this sketch.  Now, did you

6         have a piece with you contemporaneously with

7         drawing this sketch?

8    A.   I don't remember.

9    Q.   And there's a squiggly line near the top of the

10        piece.  It looks like O something D or something.

11        Do you know what that is?

12   A.   I believe that's old.

13   Q.   Okay.  And what's that referring to?

14   A.   As in the old preFuma design.

15   Q.   And then there's a reference to the left.  And when

16        you say preFuma design, what do you mean?

17   A.   I mean that this is how everything that I saw was

18        manufactured and made before we manufactured our

19        patented product.

20   Q.   Now, did you understand that this -- this preFuma

21        design was prior art to your invention?

22                    MR. THOMAS:  Object to the form of the

23           question.

24   A.   Can you ask the question in a different way?

25   Q.   Yeah.

1     patent office?

2             MR. THOMAS:  Objection; asked and

3      answered.

4  A.  I believe I already said I don't know who found the

5     Wikipedia page, but I know it was included in the

6     filing.

7  Q.  So there's a reference here to heater, I believe,

8     correct me if I'm wrong.

9  A.  I'm sorry, where are you looking?

10  Q.  I'm on the sketch, Exhibit 2.

11  A.  Thank you.  Okay.

12  Q.  Is that word "heater"?

13  A.  I believe that is the word, "heater."

14  Q.  And what are you referring to here?

15  A.  If you'll note it's pointing to a wire coming down

16     the side and that wire is -- that portion of wire

17     is the heating element.

18  Q.  And what portion of that wire becomes heated, to

19     the best of your understanding, when you sketched

20     this?

21  A.  This is a rough sketch, and there's no specific

22     part of that wire that is directly heated.  It

23     could be any part of it, but it's specifically not

24     in the center of airflow or in the airflow itself.

25  Q.  Where -- where does the airflow travel through this

1    design you sketched?

2  A.  I believe there's the word "airflow" at the bottom

3      of the sketch pointing an arrow up the center

4      middle.

5  Q.  And where does the airflow exit?

6  A.  Well, in this particular sketch, it appears to be

7      in the top center.

8  Q.  So there's an aperture for airflow in the bottom

9      center and an aperture for airflow coming out at

10     the top center of this cartridge?

11 A.  In this particular drawing.

12 Q.  And is this an accurate depiction of the Smoke 51

13     two-piece device that you had ordered?

14 A.  Yes, as well as many others.

15 Q.  Now, I see a heater wire and it looks like -- where

16     does it begin and where does it end?

17 A.  I'm sorry, where are you looking?

18 Q.  Well, you have the heater with an arrow to a wire

19     you referred to, and --

20 A.  Yes.

21 Q.  -- I'm trying to figure out when you sketched this

22     where does the wire begin and where does the wire

23     end.

24 A.  Well, it appears from the drawing that the wire at

25     one end is terminated to the side.  If you note at

1    Furthermore, you will get -- the capillary

2    action of the batting material lacks the capacity

3    to flow at a consistent rate based on how tightly

4    it's wound based on a lot of other factors as well.

5    And ultimately when the user begins to use it

6    at a very high rate you will end up burning the

7    batting material, thus causing a burn flavor and

8    causing the cartridge to go bad early when there's

9    plenty of liquid in it and that's just the

10   beginning of the problems.

11   Q.   You referred to batting material.  What do you

12        mean?

13   A.   It's a solution holding medium.  You can use any

14        number of ways to do this, but in this particular

15        original design, they used a cotton material,

16        batting material of sorts, to suspend the liquid in

17        so that the liquid had something it was adhering to

18        within the cartridge.

19   Q.   Now, did the batting material in the Smoke 51

20        cartomizer surround the airflow channel?

21   A.   It appeared to.

22   Q.   And is that illustrated in Defendant's Exhibit 2?

23   A.   The batting material is not necessarily exhibit --

24        shown here.  It's implied, but, again, it appears

25        to be that that's the way it's drawn.

1   Q.   What's incorrect about that?

2   A.   It didn't -- it didn't have to and not all of them

3         did, and while -- where I'm discussing is the

4         products at that time.  Smoke 51 is part of that

5         corral of products, but -- and I believe the

6         Smoke 51 did use the threads to pass power;

7         however, I'm not sure every one did.

8   Q.   Right.  And we're focused on the Smoke 51 two-piece

9         that you ordered back in late 2008 and you took the

10        top off of the cartomizer.  That's what I want to

11        focus on.  Are you with me?

12                MR. THOMAS:  Object to the form of the

13          question, misrepresents prior testimony.

14   Q.   Are you with me?

15   A.   I understand that's what you're inquiring about.

16   Q.   Okay.

17   A.   However, I'm -- I think that I'm -- I'm clear about

18        the fact that they -- this is a general category of

19        products.

20   Q.   And in the Smoke 51 Duo that you took the top off

21        prior to filing your provisional applications, that

22        product had a battery as a power source, correct?

23   A.   It could.

24   Q.   Did it or did it not, the one you had in your

25        possession?

```
1    A.   I had ones that did.
2    Q.   And the ones you had in your possession had a
3         threaded connection between the cartomizer and the
4         battery, correct?
5    A.   Correct, they used an inclined plane that was a
6         thread.
7    Q.   And just so we're clear, you like to call a
8         threaded connection an inclined plane.  That's what
9         we're referring to.
10   A.   It's one version of an inclined plane.
11   Q.   And the version of an inclined plane that the Smoke
12        51 Duo had is a threaded connection version of an
13        inclined plane, correct?
14   A.   The thread --
15                  MR. THOMAS:  Object to the form of the
16            question.
17   Q.   A threaded connection.
18                  MR. THOMAS:  Object to the form of the
19            question, if that was a question.  Go ahead, if
20            you understand.
21   A.   I don't.
22   Q.   You don't understand what a threaded connection is?
23   A.   I do understand what a threaded connection is, but
24        they all used an inclined plane to connect and
25        whether the inclined plane was short or long it
```

1    didn't matter, so, yes, they used an inclined

2    plane.

3  Q.  And did it use a threaded connection?

4  A.  They did.  They used an inclined plane.

5  Q.  And the threaded connection was used to

6    mechanically connect the cartomizer to the battery

7    in the Smoke 51 Duo, correct?

8  A.  Correct.

9  Q.  And it also was the means by which an electrical

10    connection was made between the cartomizer and the

11    battery power source, correct?

12  A.  In the Smoke 51 product, yes.  Again, other

13    products could have done it differently.

14                          - - - -

15        (Thereupon, Defendant's Exhibit 3 was marked

16                  for identification.)

17                          - - - -

18  Q.  That's for you.

19  A.  Thank you.

20  Q.  Let me have it real quick.

21  A.  Yeah.

22  Q.  I'm going to show you what I've marked as

23    Defendant's Exhibit 3.  It's a certified copy of

24    the '604 Patent that you folks produced to us.  It

25    bears Fuma 19 through 37 and I'll ask if you

1    the central axial passage airflow that we've placed

2    it in.  And that -- and that shows, and you'll see,

3    "Place heating element in the center with the

4    wicking material extending into the medium."

5        It goes on to say some more, but the gist of

6    it is this is the beginning concepts.  This is the

7    ground -- the foundational groundwork for the

8    Fuma-designed cartomizer.

9  Q.  So just so I'm clear, so then GEN 2 is near my what

10    was done before you and then as we get to GEN 3,

11    that's transitioning into your inventive work.  Am

12    I understanding that incorrectly?

13  A.  Into our inventive work, yes.

14  Q.  So how did you -- who came up with the idea of

15    placing the heating element in the airflow channel

16    with this -- with the wick material?

17  A.  Actually, it would be the heating element in or

18    around the airflow.  The key with it is that, yes,

19    the heating element is in the airflow or around the

20    airflow.  The real key behind this, and I'll go

21    back to Claim 1, it's vaporizing the solution into

22    a vapor in the airflow and that -- that original

23    idea was mine.

24  Q.  And when did you have that idea?

25  A.  It was -- it was in two thousand -- it was in 2009.

1    Q.    Before the provisionals?

2    A.    Yes.

3    Q.    You seem pretty certain of that.

4    A.    Yeah, I am very certain of that.

5    Q.    Why are you so certain of that?

6    A.    Because it was a major aha moment for me, as I was

7          so told --

8    Q.    I love that band.

9    A.    -- what an aha moment is.  Yeah, right.

10   Q.    And what do you mean by "aha moment"?  I think most

11         of us do know, but somebody looking at this . . .

12   A.    It's the moment that it -- that all the pieces of

13         the puzzle come together and you have that creative

14         idea of how to solve a very complex problem, and

15         this is an extremely complex problem.

16   Q.    And so this aha moment, it consisted of conceiving

17         the idea of putting the heating element in the

18         airflow?

19   A.    It consisted of vaporizing the solution in or

20         around the airflow so that the vaporization process

21         actually takes place in the actual airflow.

22   Q.    And where were you when you had this aha moment?

23   A.    I don't remember.  I -- it was -- I was -- but

24         you've got to understand at that point in time I

25         was thinking about this all the time.

```
 1   Q.   Was anybody with you when you had this aha moment?
 2   A.   I remember being alone for this part of the aha
 3        moment.
 4   Q.   And who did you report this aha moment to, if
 5        anyone?  Who was the first person you reported it
 6        to?
 7   A.   That would be Rebecca, my wife.
 8   Q.   And how soon after this aha moment did you report
 9        it to her?
10   A.   I don't remember.  It was shortly after, but I
11        don't -- I couldn't give you exact timing.
12   Q.   Where were you when you reported it to her?
13   A.   I don't remember.
14   Q.   Where did --
15   A.   I remember telling her.  That's all I remember.
16   Q.   What did you tell her?
17   A.   "I figured out the problem."
18   Q.   I'm assuming you said more than that, but maybe I'm
19        wrong.  You just said, "I figured out the problem"
20        or did you elaborate?
21   A.   I probably elaborated, but, I mean, I don't
22        remember the exact conversation.  I know I was
23        complaining to her about using this other product
24        and I was so absolutely frustrated as a prior
25        smoker.
```

```
 1              probably a good time to --
 2                   MR. THOMAS:  Okay, I've got some
 3              redirect, so whenever you're finished you just
 4              let me know.
 5                   MR. GABRIC:  Okay.  I'm finished.
 6                   MR. THOMAS:  Okay.
 7                        -  -  -  -
 8           DIRECT EXAMINATION OF GREGORY D. CONLEY
 9      BY MR. THOMAS:
10  Q.   Do you recall you had given some testimony earlier
11       today, Mr. Conley, concerning a Smoke 51 device, a
12       Kanger device and a Loong Totem two-piece design, I
13       believe you called it.  Do you recall that?
14  A.   Yes, I do.
15  Q.   Okay.  Were there any differences, to your
16       knowledge, between the two-piece devices that I
17       just described?
18  A.   No.  As far as how they functioned, they all
19       functioned the same and they were all built the
20       same.  I pulled the top off of all of them, looked
21       down in there, saw the same burnt batting material.
22       All of them were identical.
23  Q.   Where did you see -- when you pulled the top off
24       and looked inside, what did you notice, if
25       anything, about where the heating element was?
```

1   A.   It was the same configuration, all three.  The

2        heating element went down through the batting

3        material and was the source of all the problems I

4        initially encountered when I got into this

5        industry.

6   Q.   I'm going to show you what we've marked as Exhibit

7        2 or if you could pull it out.  We marked it as

8        Exhibit 2 earlier in the case.  Could you pull that

9        out?

10  A.   Okay.  I have that document here.

11  Q.   Hang on a second.  I've got to find mine.

12       Hold on.  I've got the wrong exhibit number.

13  A.   It's not Exhibit 2?

14              MR. THOMAS:  It's not Exhibit 2.

15  A.   Okay.

16              MR. JORDAN:  It's -- hang on.  We just

17        have to find it in our copy.

18  A.   No worries.

19  Q.   Yes, Defendant's Exhibit 2.  I did have the right

20        one, so if you could pull that out, please.

21  A.   Okay.

22  Q.   You were asked some questions about the image

23        that's shown on the left that I believe Mr. Gabric

24        had you mark some pieces of.  Do you recall that?

25  A.   Yeah, he had me mark that up on Exhibit 2 A, which